RIVER & HARBOR TRANSP. CO. v. BARBER ASPHALT PAVING CO.

(District Court, S. D. New York. December 15, 1909.)

SHIPPING (§ 58*)—CHARTER PARTY—LOSS OF VESSEL—LIABILITY OF CHARTERER.
    Sinking of carfloat at Maurer, New Jersey. A claim of faults upon the part of the Asphalt Company in failing to properly care for the libellant's float, which sank at the respondent's wharf, not sustained, there being no proof to show any negligence on the part of the respondent.
    [Ed. Note.—For other cases, see Shipping, Dec. Dig. § 58.*]

(Syllabus by the Judge.)

In Admiralty. Action by the River & Harbor Transportation Company against the Barber Asphalt Paving Company. Libel dismissed.

Robinson, Biddle & Benedict, for libellant.

Kellogg & Rose, for respondent.

ADAMS, District Judge. The River & Harbor Transportation Company brought this action against the Barber Asphalt Paving Company to recover the damages caused, on or about April 7, 1907, by the sinking of the libellant's float No. 2 and the loss of certain railroad ties loaded thereon. It is alleged that the float was lying at the respondent's pier at Maurer, New Jersey, in the sole possession, custody

and control of the respondent, and that during that night, or the next day, by reason of the carelessness and negligence of the respondent it sank at its moorings, causing the loss of some of the ties and damage to the float, said to have been altogether $3,000.

The answer, after some admissions and denials, alleges:

"That heretofore and on or about the 11th day of October, 1906, this respondent entered into a contract with the Long Island Railroad Company, a corporation organized and existing under and by virtue of the Laws of the State of New York, to creosote 50,000 yellow pine cross-ties, of the sound square edge variety, sometimes called sap ties, and in the event that the shipment was to be made by water, this respondent was to do no handling of the treated ties after putting them over the rail of the vessel on which they were to be shipped.

That thereafter and on or about the 21st day of March, 1907, this respondent entered into another agreement with the said the Long Island Railroad Company whereby this respondent agreed to stow the said 50,000 creosoted ties on cars on floats of the said Long Island Railroad Company, alongside of the respondent's pier at Maurer, New Jersey.

That on or about the 6th day of April, 1907, the said Long Island Railroad Company placed or caused to be placed alongside of respondent's pier at Maurer, New Jersey, 'Long Island Railroad Carfloat No. 2.'

That on the 6th day of April, 1907, respondent proceeded to stow the said creosoted ties of the Long Island Railroad Company on cars on said float, and on Saturday evening, April 6th, 1907, had loaded in a careful and thoroughly workmanlike manner four cars, containing in all about 2,000 of said creosoted ties.

That upon information and belief, the said 'Long Island Railroad Carfloat No. 2' was unseaworthy and not properly equipped with lines and appliances: that there was want of due care on the part of the owner or master and a failure to exercise proper supervision for the safety of the vessel while she was moored at respondent's pier for the purpose of being loaded, and on Sunday, the 7th day of April, 1907, at about 9:30 A. M., the said 'Long Island Railroad Carfloat No. 2,' while alongside of respondent's pier at Maurer, New Jersey, during a heavy storm and while a violent northeast wind was blowing, sank at its mooring at said pier without any fault on the part of the respondent, but solely by reason of its unseaworthy condition and because of improper and insufficient lines and equipment, and for lack of proper care and attention on the part of the owner or master or the said Long Island Railroad Company."

It appears that, in conformity with the agreement alleged in the answer, the carfloat No. 2 was landed and tied up on the northerly side on the evening of April 5th, 1907, of the respondent's wharf, a short distance from the outer end. This wharf was on the New Jersey side of the Arthur Kills. It extended some 400 feet out in the Kills and had a dredged channel on the northerly side, 6 or 8 feet deep at low water. It was ordinarily a safe place for boats to load and unload, and during the time that this float was at the place, although there was a strong wind, nothing happened to the other boats which were there. Some time early Sunday morning, the 6th, the float was discovered by the respondent's watchman to be sunk at the pier. He immediately notified the officers of the respondent, living at Sewaren, a short distance away, who went to the place as soon as they reasonably could and made some efforts to save the ties which were floating in the vicinity.

The immediate cause of the accident does not appear. The vessel may have been seaworthy. The libellant claims that she was properly made fast with 4 lines, 2 spring lines and 2 breast lines, the former running from cleats on the side of the float and the breast lines running

from the middle of the ends of the float forward and aft to the wharf. When she was found in the morning after the sinking, she had but 2 or 3 lines and 2 of them were running to the ends of the outside of the boat. The libellant claims that the lines were changed after the first mooring and that the change caused the sinking but if such is the fact there is nothing whatever to connect the respondent with the change. It contracted to creosote the ties and load them on the float. When loaded the float was listed somewhat but it was only about 10 or 12 inches and not enough to cause the sinking, as she still had about 2 feet of freeboard. The listing does not show a sufficient want of care on the respondent's part to condemn it, even if it had held itself out as possessing customary skill in the loading of boats.

The respondent defends on several grounds, i. e., the storm, the unseaworthiness of the float, and the lack of proper care and attention on the part of the Long Island Railroad Company.

The first two defences have already been considered. Upon the third, the question arises whether the libellant, or the railroad, as its agent, failed to properly fit out the float. She had no one on board to care for her. She had made three trips to this place. The first time she had a man on board. The second and third times, she did not. While the absence of a person on board may not have been the cause of the accident, yet under such circumstances as existed here, it is strongly suggestive of negligence on the part of those managing the float. We are left entirely in the dark as to what occurred after the railroad company's tug, which had towed the float to the place, left, and to consider that the respondent was in any way negligent would be to enter into the realms of conjecture. The float was not in the possession of the respondent.

The libel is dismissed.